Erin Rose Ronstadt, SBN 028362
Clayton Warren Richards, SBN 029054
OBER PEKAS RONSTADT, PLLC
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oprdisabilitylaw.com
clayton@oprdisabilitylaw.com

Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Byrnes, a married woman,<br><br>    Plaintiff,<br><br>v.<br><br>UnitedHealth Group Benefits Plan, an ERISA benefit plan; The Standard Insurance Company, a plan fiduciary; and UnitedHealth Group Employee Benefits Plan Administrative Committee, a plan administrator,<br><br>    Defendants. | No.<br><br>**COMPLAINT** |

For her claims against UnitedHealth Group Benefits Plan (the "Plan"), an ERISA benefit plan; The Standard Insurance Company ("The Standard"), a plan fiduciary; and UnitedHealth Group Employee Benefits Plan Administrative Committee ("The Committee"), a plan administrator and fiduciary (collectively "Defendants"), Plaintiff Barbara Byrnes ("Ms. Byrnes" or "Plaintiff") alleges as follows:

**Jurisdiction, Venue and Parties**

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2. The Plan is a purported ERISA benefit plan established and maintained by UnitedHealth Group for the benefit of its employees.

3. Ms. Byrnes was a participant and beneficiary of the Plan as an employee of UnitedHealth Group.

4. UnitedHealth Group is the Plan Sponsor and Ms. Byrnes' former employer.

5. The Committee is a Plan fiduciary and Plan administrator.

6. The Standard is a third-party claims administrator for the Plan and a Plan fiduciary.

7. The Committee and The Standard have a duty to administer the Plan prudently and in the best interests of all Plan participants and beneficiaries.

8. At the time Ms. Byrnes sought long-term disability ("LTD") benefits under the Plan, The Standard administered claims for UnitedHealth Group under the Plan, acted on behalf of the Plan, and acted as an agent of UnitedHealth Group and/or the Plan to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

9. Ms. Byrnes currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

10. The Plan, The Committee, and UnitedHealth Group have their principal places of business in the State of Minnesota.

11. The Standard has its principal place of business in the State of Oregon.

12. Defendants The Standard and UnitedHealth Group are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

13. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

14. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### *Ms. Byrnes' Disability*

15. Ms. Byrnes suffers from a number of physical diseases, including lumbar spondylosis, inflammatory spondylopathy, and sacroiliitis; cervical radiculopathy and

bilateral hand paresthesias; bilateral hip bursitis and pain (requiring a right-sided total hip replacement); fibromyalgia; bilateral rotator cuff tears (each requiring surgery); and a right-sided ganglion cyst (also requiring surgery).

16. Ms. Byrnes' surgical history since the onset of her Disability is extensive.

17. In March 2017, she underwent a right shoulder arthroscopic debridement and biceps tenotomy, rotator cuff repair with acromioplasty, and acromioclavicular joint excision.

18. In July 2017, she underwent a right total hip replacement.

19. In September 2017, she underwent an arthroscopic biceps tenotomy and rotator cuff repair with acromioplasty on the left side.

20. In November 2019, she had a right volar wrist ganglion cyst removal.

21. Ms. Byrnes has also had a number of pain management procedures, including lumbar medial branch blocks, radiofrequency ablations, and bilateral sacroiliac joint injections; cervical medial branch blocks and epidural steroid injections; nerve blocks to her right hip; and Depo Medrol injections to both hips and shoulders.

22. Ms. Byrnes received these treatments throughout her Disability claim, including beyond the date The Standard terminated her LTD benefits.

23. Ms. Byrnes also had extensive physical therapy for her neck, shoulder, and lower back pain.

24. Diagnostic imaging confirmed multi-leveled degenerative changes in Ms. Byrnes' neck and low back, including nerve root contact in the low back.

25. Ms. Byrnes' ongoing Disability is supported by the objective clinical findings of record, the diagnostic imaging, Ms. Byrnes's consistent reports of Disabling symptoms, her course of treatment, and an independent functional capacity evaluation, which is attached here. [Attachment A.]

OBER PEKAS RONSTADT, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**Plan Language**

26. Under the Plan, from September 1, 2017 (Ms. Byrne's first date of entitlement to LTD benefits) to September 1, 2019, Ms. Byrnes must be Disabled from her Own Occupation.

27. The Plan provides that an individual is Disabled from her Own Occupation when she is 1) "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation"; and 2) she "suffer[s] a loss of at least 20% in [her] Indexed Predisability Earnings when working in [her] Own Occupation."

28. The Plan defines "Own Occupation" as "any employment, business, trade, profession, calling, or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Participating Employer when Disability begins."

29. The Plan states that The Standard "may also look at the way [your Own Occupation] is generally performed in the national economy."

30. The Plan defines Material Duties as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably omitted or modified. In no event will [The Standard] consider working an average of more than 40 hours per week to be a Material Duty."

31. After 24 months, or effective September 2, 2019, Ms. Byrnes must be "unable to perform with reasonable continuity the Material Duties of Any Occupation."

32. The Plan defines Any Occupation as "any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within 12 months following your return to work, regardless of whether you are working in that or any other occupation."

33. Under the Plan, Indexed Predisability Earnings are the individual's "Predisability Earnings adjusted by the rate of increase in the [Consumer Price Index for Urban Wage Earners and Clerical Workers or] CPI-W. During your first year of Disability, [the LTD claimant's] Indexed Predisability Earnings are the same as [her] Predisability Earnings. Thereafter, [her] Indexed Predisability Earnings are determined on each anniversary of [her] Disability by increasing the previous year's Indexed Predisability Earnings by the rate increase of the CPI-W for the prior calendar year. The maximum adjustment in any year is 10%. [The claimant's] Indexed Predisability Earnings will not decrease, even if the CPI-W decreases."

### Ms. Byrnes' Employment

34. Ms. Byrnes worked at UnitedHealth Group as a Senior Claims Business Process Consultant.

35. UnitedHealth Group was the Participating Employer under the Plan.

36. In that position, Ms. Byrnes analyzed claims systems processes, capacities, utilization, and optimization for UnitedHealth Group.

37. According to a Detailed Job Specialty Report completed by The Standard's vocational consultant, Stephanie Wexler, Ms. Byrnes' job falls under the title of Claim Examiner in the Dictionary of Occupational Titles ("DOT").

38. Ms. Wexler concluded the job "is within the sedentary strength rating per the Dictionary of Occupational Titles . . .."

39. Under the DOT, the job of Claim Examiner is also a skilled job with a Specific Vocational Preparation ("SVP") rating of 7, indicating the job would take over two years, and up to and including four years, to learn and perform efficiently.

40. According to the Selected Characteristics of Occupations ("SCO"), a companion publication to the DOT, the SVP code denotes "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Lapsed time is not the same as work time."

41. According to Ms. Wexler's vocational review, Ms. Byrnes' job requires frequent reaching, handling, and fingering, and above-average aptitudes in general learning, verbal, and clerical perception.

42. The DOT defines sedentary work as requiring up to two hours of combined standing and walking, and sitting "most of the time," or for the remainder of the workday.

43. This would necessarily entail at least six hours of sitting.

44. According to The Standard's report, the job of Claim Examiner entails analyzing and investigating insurance claims for an insurance carrier, ascertaining the validity of claims, and corresponding with agents and claimants.

45. Ms. Byrnes last worked in any capacity on March 5, 2017.

46. The onset of Ms. Byrnes' Disability coincided with her right shoulder surgery in March 2017.

47. She stopped working due to her Disability.

### Ms. Byrnes' LTD Benefits

48. Ms. Byrnes applied for and received short-term disability ("STD") benefits through Sedgwick, UnitedHealth Group's STD administrator, effective from March 13, 2017 through the maximum benefit duration for STD benefits, September 1, 2017.

49. Ms. Byrnes' STD benefits commenced after a seven-day waiting period beginning after her date of Disability, as required under the terms of the UnitedHealth STD plan.

50. During this time, in July 2017, Ms. Byrnes underwent her right hip replacement surgery.

51. After exhausting her STD benefits, Ms. Byrnes received LTD benefits from The Standard effective September 1, 2017.

52. On September 13, 2017, Ms. Byrnes had a left shoulder surgery.

53. In December 2017, x-rays of Ms. Byrnes' cervical and lumbar spines revealed degenerative changes including disc space narrowing and facet arthrosis.

54. By early 2018, Ms. Byrnes continued to experience significant pain in her neck, bilateral shoulders, low back, and right hip.

55. As a result, Ms. Byrnes could not walk for any significant time or lift any significant weights.

56. Ms. Byrnes obtained a transcutaneous electrical nerve stimulation unit, or "TENS unit," to help with back pain, but experienced no significant relief.

57. Magnetic resonance imaging ("MRI") of Ms. Byrnes' lumbar spine in May 2018 revealed significant findings, including lateral recess narrowing at the L5-S1 level contacting the exiting S1 nerve root.

58. Compared to prior imaging, this lumbar MRI showed progressing degenerative changes.

59. In October 2018, The Standard "rescored" Ms. Byrnes' claim from "4A" to "2A" because Ms. Byrnes remained out of work for over a year since her LTD effective date.

60. In January 2019, Ms. Byrnes was still undergoing physical therapy and new pain management procedures, and experienced ongoing right hip pain.

61. Nevertheless, on April 3, 2019, The Standard's nurse case manager Karen Southard referred Ms. Byrnes' claim to an internal medicine consultant.

62. From April 3, 2019 until May 10, 2019, The Standard documented no activity in Ms. Byrnes' claim file, pending the result of the peer consultant review.

63. On April 11, 2019, The Standard's physician consultant, Dr. Richard Handelsman, issued a summary report concluding that, effective January 26, 2018, Ms. Byrnes could not lift, carry, push, or pull weights greater than ten pounds, but she could constantly stand or walk without resting and frequently perform a variety of postural maneuvers.

64. Dr. Handelsman purported to address Ms. Byrnes' restrictions and limitations but failed to address any limitations in Ms. Byrnes' ability to sit despite acknowledging objective diagnostic evidence of lumbar degenerative disc disease, Ms. Byrnes' ongoing

complaints of back pain, and her course of treatment, including lumbar pain management procedures.

65. The Standard's vocational case manager Chris Karellas authored a letter dated May 10, 2019 concluding that the restrictions and limitations Dr. Handelsman assigned would not preclude Ms. Byrnes from performing her own job of Claims Business Process Consultant.

66. In a letter dated May 27, 2019, The Standard terminated Ms. Byrnes' LTD benefits (the "Denial").

67. Ms. Byrnes appealed the Denial on her own (the "Appeal") in a handwritten letter 16 days after the Denial.

68. Ms. Byrnes explained she was experiencing ongoing flare-ups, pain, and fatigue.

69. Updated medical records reflect her medical conditions required further invasive pain management around this time, including a right hip nerve block in June 2019. [Exhibit A.]

70. In a June 17, 2019 visit with her pain management doctor, Ms. Byrnes reported "0% improvement" after recent cervical and lumbar radiofrequency ablation procedures. [Exhibit A.]

71. Also, around this time, Ms. Byrnes was suffering from falls which required emergent care. [Exhibit B.]

72. Despite evidence of ongoing, Disabling physical limitations, The Standard upheld the Denial in August 2019, again relying on the opinion of a non-examining consultant physician, Dr. Natalie Boodin.

73. After The Standard's decision to uphold the Denial, Ms. Byrnes obtained legal representation.

74. On September 10, 2019, Ms. Byrnes' representative sent to The Standard a request to reopen and supplement Ms. Byrnes' June 2019 Appeal and a request for disclosure of relevant documents.

75. On September 24, 2019, The Standard's Benefits Review Specialist, Jamillah Sanders, sent a letter to Ms. Byrnes' attorney declining to reopen Ms. Byrnes' Appeal.

76. Ms. Sanders stated, "Ms. Byrnes' claim file will not be reopened and she has the right to file suit under Sections 502(a) of the Employment Retirement Income Security Act (ERISA)."

77. In an email dated November 25, 2019, Ms. Byrnes' representative emailed Nicole Smushko, a Disability Benefits Manager at The Standard, yet again requesting Ms. Byrnes' LTD claim be reopened "to avoid costly litigation."

78. After speaking with Ms. Byrnes' attorney telephonically, Ms. Smushko referred the case to Appeals Review Unit manager, Katie Somner.

79. Ms. Somner replied via email on November 26, 2019 refusing to reopen Ms. Byrnes' Appeal.

80. Ms. Byrnes' representative replied to Ms. Somner's email on November 26, 2019, asking her to explain how The Standard was prejudiced by allowing Ms. Byrnes additional time to supplement her Appeal; how The Standard's refusal to allow Ms. Byrnes an opportunity to supplement her Appeal was consistent with The Standard's fiduciary obligations under ERISA; and whether Ms. Byrnes had any other available administrative review options.

81. Ms. Somner responded via email the same day upholding The Standard's decision to not reopen Ms. Byrnes' Appeal.

82. In that email, Ms. Somner stated, "Because Ms. Byrnes has exhausted her appeal rights with The Standard her remaining course of action is a lawsuit."

83. The Standard repeatedly denied Ms. Byrnes' representatives' entreaties to reopen her Appeal with the benefit of representation and to supplement the record with compelling, objective evidence of Ms. Byrnes' ongoing Disability under the Plan.

84. In late 2019, Ms. Byrnes' several medical issues persisted.

85. She had surgery on her right wrist in November 2019. [Exhibit C.]

86. Despite The Standard's refusal to consider further objective evidence of Ms. Byrnes' functional abilities, or to allow Ms. Byrnes to supplement her Appeal with the benefit of legal representation, Ms. Byrnes underwent a functional capacity examination ("FCE") on December 19, 2019 to ascertain her true functional abilities. [Exhibit D.]

87. The examiner who administered the FCE concluded Ms. Byrnes "is unable to perform her past work as a Claims Business Process Consultant or any other type of SEDENTARY work on a regular and consistent basis, i.e., 8-hours per day, 5-days per week, 50-weeks per year."

88. The examiner noted Ms. Byrnes was "fully cooperative" during testing, and that "[h]er performance on exam tasks was consistent and her functional limitations were consistent with her medical history and diagnoses."

89. The examiner found Ms. Byrnes' reported symptoms and limitations to be "credible based on the objective findings."

90. The examiner concluded Ms. Byrnes could only sit, stand, and walk for a total of five hours in an eight-hour workday.

91. Ms. Byrnes cannot perform the material duties of her Own Occupation or Any Occupation and, therefore, comes within the definition of Disability under the Plan.

92. Ms. Byrnes exhausted her administrative remedies and timely filed this lawsuit.

**COUNT I**
**(Recovery of LTD Plan Benefits)**
**(Defendants The Standard and the Plan)**

93. All other paragraphs are incorporated by reference.

94. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

95. The Plan represents LTD coverage and a promise to provide LTD benefits until Ms. Byrnes is no longer Disabled under the terms of the Plan.

96. Ms. Byrnes continues to be Disabled from working in her Own Occupation and Any Occupation.

97. Ms. Byrnes has claimed the benefits under the Plan to which she is entitled.

98. Ms. Byrnes reasonably expected that her medical conditions met the requirements of Disability as defined by the Plan and that she would receive benefits under the Plan until she reaches her Social Security Normal Retirement Age or, until she was no longer Disabled.

99. Despite the coverage of Ms. Byrnes' Disability, The Standard and the Plan improperly terminated Ms. Byrnes' LTD benefits in breach of the Plan and ERISA.

100. The Standard's and the Plan's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

101. Although the Policy states The Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy," under ERISA, that can only be true if the Plan reserved that discretion to the Plan Administrator, the Plan terms provide a mechanism for the Plan Administrator to delegate that discretion, and there is evidence that the discretion was delegated in accordance with the terms of the Plan.

102. The Plan document states that the Committee, as plan administrator, "may delegate its authority and responsibilities under this Article to a Claims Administrator, provided such delegation is in writing."

103. On information and belief, the Plan does not properly confer discretion to The Standard in writing, and thus, The Standard does not have discretion under the terms of the Plan.

104. Even if The Committee properly delegated discretionary authority to The Standard, in light of The Standard's wholesale and flagrant procedural violations of ERISA, Ms. Byrnes should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established

-11-

procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

105. Instead of evaluating a participant's eligibility based on the applicable Plan language and medical evidence, Ms. Byrnes is informed and believes that The Standard makes claims decisions based on the claims resources and financial risk it faces on certain claims.

106. Here, The Standard ignored clear evidence showing Ms. Byrnes' medical condition was not improving and failed to account for all of Ms. Byrnes' limitations and restrictions.

107. The Standard denied Ms. Byrnes' claim based on the opinions of paid consultants who never examined or even spoke with Ms. Byrnes or her treating providers.

108. The Standard wrongfully denied Ms. Byrnes' disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

109. The Standard's August 8, 2019 decision letter upholding the Denial summarizes Ms. Byrnes' June 12, 2019 office visit with her pain management doctor as showing "no significant change in [her] medical conditions," "no noted urgency to escalate care," and "no exacerbation or recommendations for significant change in [her] treatment noted . . .[,]" but The Standard's finding of no change in Ms. Byrnes' medical conditions actually *supports* ongoing Disability under the Plan, because The Standard was paying Ms. Byrnes' LTD claim since September 2017.

110. No change in Ms. Byrnes' condition only means she remains Disabled under the Own Occupation definition.

111. The Standard did not properly consider all of the available evidence when terminating Ms. Byrnes' LTD benefits.

112. The Standard failed to conduct a full and fair review.

113. The Standard obstinately refused to allow Ms. Byrnes the opportunity to supplement her Appeal with the assistance of counsel, although The Standard could not explain how it was prejudiced by allowing Ms. Byrnes the full 180-day timeframe to fully develop her Appeal.

114. The Standard misstated medical evidence for its own financial benefit, *e.g.,* it excessively relied on biased medical reviews provided by in-house medical consultants.

115. The Standard relied on findings that constitute "clearly erroneous findings of fact" to deny Ms. Byrnes' benefits, such as Dr. Handelsman's and Dr. Boodin's opinions.

116. Dr. Handelsman, of instance, neglected to assign sitting restrictions despite evidence of nerve root contact in Ms. Byrnes' lower back.

117. Dr. Handelsman characterized a March 25, 2019 visit with Ms. Byrnes' pain management physicians as showing "good results" from her recent cervical injections, but a review of the actual treatment note reveals Ms. Byrnes reported significant pain relief for only six-to-seven hours after each procedure.

118. The same visit showed reduced cervical range of motion; pain with cervical range of motion and tenderness; a positive sacroiliac joint compression test; and other positive clinical findings.

119. The Standard abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, The Standard ignored the inaccuracies or created new reasons for denial.

120. Upon information and belief, The Standard tainted its medical file reviewers by giving the reviewers inaccurate information regarding Ms. Byrnes, while also failing to provide its reviewers with all of the relevant evidence.

121. Upon information and belief, The Standard provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

122. Upon information and belief, The Standard used in-house reviewers in evaluating Ms. Byrnes' claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the continuation of Ms. Byrnes' benefits.

123. The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation, or by mischaracterizing evidence.

124. The Standard routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

125. The Standard and The Committee unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its failure to provide all relevant documents.

126. Of note, in response to a second request for relevant documents submitted by Ms. Byrnes' counsel, The Standard admitted it only "received a poor electronic copy from Ms. Byrnes and a hard copy was never received."

127. The hard copy of Ms. Byrnes' Appeal that exists in the claim file is barely legible due to poor copying or scanning quality.

128. The Standard's and The Committee's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrates its abuse of discretion and improper claims handling.

129. In terminating Ms. Byrnes' LTD benefits, The Standard disregarded evidence that Ms. Byrnes' conditions had not changed or improved, such as her ongoing, invasive pain management treatment regimen including lumbar and cervical medial branch block procedures.

130. The most recent treatment records in Ms. Byrnes' LTD claim file with The Standard reflect Ms. Byrnes reported "progressing," severe right hip pain.

131. During that same treatment visit, she exhibited positive clinical findings which would suggest ongoing symptomology.

132. The Standard closed the door on this evidence, which is not consistent with a full and fair review.

-14-

133. The Standard has no evidence that Ms. Byrnes' conditions changed or improved since it determined that she met the definition of Disabled in the Policy.

134. In the August 8, 2019 decision to uphold the prior Denial, The Standard cited evidence showing "no significant change in [Ms. Byrnes'] medical conditions."

135. The Standard engaged in other procedural irregularities, which it did to serve its own financial best interests.

136. On information and belief, The Standard engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

137. The Standard reclassified Ms. Byrnes' claim from "4A" to "2A" without explaining the recategorization of her claim in its disclosure of relevant documents under ERISA.

138. The Standard intentionally gathered evidence to stack the deck in its favor and against Ms. Byrnes.

139. Ms. Byrnes alleges upon information and belief that The Standard has a parsimonious claims handling history.

140. The Standard failed to conduct a "meaningful dialogue" regarding Ms. Byrnes' claim.

141. Under the de novo standard of review, to be entitled to benefits, Ms. Byrnes need only prove by a preponderance of the evidence that she is Disabled.

142. Even under the abuse of discretion standard of review, The Standard abused its discretion, because its decision terminating Ms. Byrnes' disability benefits was arbitrary and capricious and caused or influenced by The Standard's, its reviewing physicians', and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

143. Plaintiff is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of The Standard's reviewing physicians', its employees', and

its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Ms. Byrnes' LTD claim.

144. Under the de novo standard of review, Ms. Byrnes is entitled to discovery regarding, among other things, the credibility of The Standard's medical reviews and The Standard's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

145. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Ms. Byrnes is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

146. Ms. Byrnes is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her Disability benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

147. Pursuant to 29 U.S.C. § 1132(g), Ms. Byrnes is entitled to recover her attorneys' fees and costs incurred herein.

148. Ms. Byrnes is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

**COUNT II**
**(Breach of Fiduciary Duty)**
**(The Standard and The Committee)**

149. All other paragraphs are incorporated by reference.

150. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

151. The Standard is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Byrnes.

152. The Committee is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Byrnes.

153. Under 29 U.S.C. § 1104(a), The Standard and The Committee are required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

154. Under ERISA, which is founded in trust principles, The Standard and The Committee are required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

155. In multiple ways throughout the administration of Ms. Byrnes' claim, The Standard and The Committee breached their fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

156. The Standard's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because The Standard's claims handling was discharged imprudently and caused Ms. Byrnes serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

157. The Standard refused to allow Ms. Byrnes to supplement her Appeal, without a showing of prejudice to The Standard.

158. To the extent that The Standard's denial of benefits caused Ms. Byrnes harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

159. On information and belief, The Standard instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals based on bias or its financial interests.

160. Ms. Byrnes is informed and believes that The Standard's employees are trained in administering claims in the best interests of The Standard, not Plan participants.

161. The Standard demonstrated bias and malice against Ms. Byrnes through its employees. Instead of fully and fairly reviewing the medical evidence, The Standard unreasonably denied Ms. Byrnes' claim based on unreliable evidence, such as the aforementioned medical consultant reviews.

162. The Standard's failure to act prudently and in the best interests of Ms. Byrnes is a breach of fiduciary duty requiring appropriate equitable relief following discovery of The Standard's conduct as it relates to Ms. Byrnes' claim.

163. The Standard's correspondence with Ms. Byrnes' representative regarding the supplementation of the Appeal clearly illustrates it was not acting in the best interests of Ms. Byrnes, but was only acting in its own interests.

164. Ms. Byrnes is informed and believes that The Standard has targeted claims under the Plan, including Ms. Byrnes' claim, which is a breach of fiduciary duty.

165. On information and belief, The Standard breached its fiduciary duty to Ms. Byrnes by terminating her claim in an effort to avoid its financial liability.

166. The Committee breached its fiduciary duties by failing to perform the fiduciary duties imposed by ERISA, including having plan documents that meet the statutory requirement, failing to monitor The Standard's claim handling, failing to ensure The Standard performed its duties under the Plan, and failing to take prudent or appropriate corrective action.

167. Based on the facts of this case, Ms. Byrnes has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Byrnes whole for her losses from The Standard's and The Committee's breaching conduct.

168. The Court has broad discretion to fashion appropriate relief to make Ms. Byrnes whole and should mold the relief necessary to protect the rights of the participants.

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

169. Ms. Byrnes is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

170. She is entitled to enjoin any act or practice by The Standard and The Committee that violate ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in equity.

171. The Standard was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Ms. Byrnes' benefits for its own profit.

172. The Standard engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, which is conduct the Court can enjoin.

173. The Committee failed to perform its fiduciary duties under ERISA and the Plan.

174. The Standard acted with malice and in bad faith against Ms. Byrnes, which constitutes a violation of its fiduciary obligations.

175. ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. Byrnes by The Standard's and The Committee's breach of fiduciary duty violations.

176. As a direct and proximate result of the breaches of fiduciary duty, Ms. Byrnes suffered actual, *significant* financial harm and has incurred financial expense.

177. Ms. Byrnes is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid in full.

178. Pursuant to 29 U.S.C. § 1132(g), Ms. Byrnes is entitled to recover her attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Ms. Byrnes prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past LTD benefits under the terms of the Plan;

B. Clarifying and determining Ms. Byrnes' rights to future benefits under the terms of the Plan;

C. For any other benefits Ms. Byrnes may be entitled to receive under the Plan due to her Disability;

D. All other equitable relief that is proper as a result of The Standard's and The Committee's breaches of fiduciary duties;

E. An award of Ms. Byrnes' attorneys' fees and costs incurred herein;

F. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 7th day of February, 2020.

OBER PEKAS RONSTADT, PLLC

By: *s/ Erin Rose Ronstadt*
  Clayton W. Richards
  Erin Rose Ronstadt
  Attorneys for Plaintiff